COPY

1  | MARILYN E. BEDNARSKI (No. 105322)
   | DAVID S. McLANE (No. 124952)
2  | KEVIN J. LaHUE (No. 237556)
   | KAYE, McLANE & BEDNARSKI
3  | 234 E. Colorado Blvd. Suite 230
   | Pasadena, CA 91101
4  | Telephone: (626) 844-7660
   | Facsimile: (626) 844-7670
5  | E-mail: mbednarski@kmbllp.com
   | E-mail: dmclane@kmbllp.com
6  | E-mail: klahue@kmbllp.com

7  | LINDA STARR (No. 118789)
   | PAIGE KANEB (No. 251184)
8  | NORTHERN CALIFORNIA
   | INNOCENCE PROJECT
9  | at Santa Clara University
   | 900 Lafayette Street, Suite 105
10 | Santa Clara, CA  95050
   | Telephone: (408) 554-1945
11 | Facsimile: (408) 554-5440
   | Email: LStarr@scu.edu
12 | Email: PKaneb@scu.edu

13 | Attorneys for Plaintiff,
   | OBIE STEVEN ANTHONY, III

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17                  **WESTERN DIVISION**

18 | OBIE STEVEN ANTHONY III,          ) CASE NO. EDCV12-1332 DSF (DTBx)
                                       )
19 |               Plaintiff,          ) **COMPLAINT FOR DAMAGES:**
                                       )
20 |                                   )
                                       )
21 |          vs.                      ) **(1) DEPRIVATION OF CIVIL**
                                       ) **RIGHTS, 42 U.S.C., §1983,** *BRADY*
22 | CITY OF LOS ANGELES;              ) **VIOLATIONS;**
   | MARCELLA WINN; PETE               )
23 | RAZANSKAS; and DOES 1-10          ) **(2) JOINT ACTION/CONSPIRACY**
                                       ) **TO INTERFERE WITH CIVIL**
24 | INCLUSIVE,                        ) **RIGHTS, 42 U.S.C., §1983,** *BRADY*
                                       )
25 |               Defendants.         ) **(3) DEPRIVATION OF CIVIL**
                                       ) **RIGHTS, 42 U.S.C., §1983,**
26 |                                   ) *MANSON/BIGGERS* **VIOLATIONS;**
                                       )
27 |                                   ) **(4) JOINT ACTION/CONSPIRACY**
                                       ) **TO INTERFERE WITH CIVIL**
28 |_____|

**RIGHTS, 42 U.S.C., §1983,**
***MANSON/BIGGERS* VIOLATIONS;**

**(5) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C., §1983, FALSE EVIDENCE VIOLATIONS;**

**(6) JOINT ACTION/CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, 42 U.S.C. § 1983, FALSE EVIDENCE VIOLATIONS;**

**(7) VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983, SUPERVISORIAL LIABILITY; and,**

**(8) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983, *MONELL* VIOLATIONS**

**DEMAND FOR JURY TRIAL.**

## I.

## JURISDICTION AND VENUE

1.     This action is brought by Plaintiff Obie Steven Anthony III ("Mr. ANTHONY") pursuant to 42 U.S.C. § 1983.

2.     This Court has jurisdiction under 28 U.S.C. § 1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. § 1983 and under 28 U.S.C. § 1331.

3.     The acts and omissions complained of commenced on March 27, 1994 and continued until November 18, 2011 within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. § 1391.

## II.

## INTRODUCTION

4.     On June 28, 1994, Los Angeles Police Department detectives Marcella Winn and Pete Razanskas arrested Mr. Anthony for the murder of Felipe Gonzales. Mr. Anthony was convicted of that murder in 1995 and sent to prison for life

1  without possibility of parole based on the since discredited testimony of

2  eyewitnesses, one of whom got a deal that was suppressed by Defendants Winn and

3  Razanskas.  For over seventeen years, Mr. Anthony adamantly denied his guilt and

4  did all he could to challenge his conviction.  On September 30, 2011, after an

5  extensive evidentiary hearing on Mr. Anthony's petition for writ of habeas corpus,

6  Judge Kelvin Filer of the Los Angeles County Superior Court reversed Mr.

7  Anthony's conviction and on November 18, 2011, the District Attorney's office

8  dismissed the charges.

9       5.      In overturning the conviction, the court found that Mr. Anthony's

10  conviction was based on materially false evidence and suppression of material

11  evidence favorable of innocence, and that the combination of all errors clearly

12  established a reasonable probability of a different outcome.  The court found no

13  doubt that John Jones was the prosecution's key witness, was "an inherently

14  unreliable witness," and that as a result of Defendants' misconduct, the jury did not

15  hear all of the truth about John Jones.  Findings of Fact and Conclusion of Law. pp.

16  18-19.  Police concealed that John Jones received a "quid pro quo" for his

17  testimony, a fact John Jones denied at trial.  Jones' false testimony on this point was

18  compounded by the Defendants' failure to correct that perjured testimony or to

19  inform the deputy district attorney prosecuting Mr. Anthony of the truth.  "It

20  naturally follows that if a witness's false testimony is corrected by the prosecution,

21  his 'willingness to lie under oath is exposed and his credibility is irreparably

22  damaged. [citations omitted]'  [J]ones Jones [sic] testimony was inherently false,

23  and the showing of its falseness undermines the reviewing courts [sic] confidence

24  in the outcome of the trial. [citations omitted]"  Finding of Fact and Conclusions of

25  Law, pp. 21-22.

26       6.      The court also found that the additional misconduct from Defendants

27  further prejudiced Mr. Anthony and resulted in his wrongful conviction.  "In short,

28  petitioner's [Mr. Anthony's] claim that his conviction was based on material false

1  testimony from John Jones is well-founded and has been established by evidence

2  presented at the hearing.  The effect of this error was compounded by information

3  contained in the claims of *Brady* error, to wit, failure to disclose that John Jones'

4  daughters were eyewitnesses; not turning over the information that Arthur Jones

5  incorrectly picked a 'filler' when he looked at the 6-pack that contained Reggie

6  Cole; and not revealing that Ronald Brock, another security guard at Martin Luther

7  King Hospital, was shown 6-packs and did not identify Reggie Cole or petitioner."

8  Findings of Fact and Conclusions of Law, p. 19-20.

9       7.      Based on accumulated errors at trial, the Court concluded that Mr.

10  Anthony was denied due process and a fair trial, saying, "This Court firmly believes

11  that had the jury heard the evidence that was omitted or excluded, … it likely would

12  have affected the outcome of the trial." Findings of Fact and Conclusions of Law, p.

13  24.

14      8.      Mr. Anthony spent more than 17 years in custody as a result of the

15  wrongful actions of the Los Angeles Police Department and defendants Winn and

16  Razanskas.

17      9.      In addition, the policies and customs of the Los Angeles Police

18  Department were moving forces behind the violations of Mr. Anthony's rights.  As a

19  result of these actions, Mr. Anthony was deprived of the one thing all innocent

20  people deserve: freedom.

21                                    **III.**

22                                  **PARTIES**

23      10.     Plaintiff Obie Steven Anthony III, is a resident of the State of

24  California and resided within the jurisdiction of the State of California at all times

25  herein alleged.

26      11.     At all times relevant herein, Defendant Marcella Winn was employed

27  by and working on behalf of the Los Angeles Police Department, and resided within

28  the jurisdiction of the State of California.  In her capacity as a Los Angeles Police

1  Department officer, she actively participated in the investigation resulting in the

2  prosecution and wrongful conviction of Mr. Anthony.  Defendant Winn is sued in

3  her individual capacity.

4      12.    At all times relevant herein, Defendant Peter Razanskas was employed

5  by and working on behalf of the Los Angeles Police Department, and resided within

6  the jurisdiction of the State of California.  Plaintiff is informed and believes that Mr.

7  Razanskas is currently retired.  In his capacity as a Los Angeles Police Department

8  officer and detective, he actively participated in the investigation resulting in the

9  prosecution and wrongful conviction of Mr. Anthony. Pursuant to his duties,

10  Defendant Razanskas was also responsible for the supervision and training of

11  Defendant Winn.  Defendant Razanskas is sued in his individual capacity, and for

12  his failure to properly supervise Defendant Winn.

13      13.    At all times mentioned herein, Defendant City of Los Angeles was a

14  public entity, organized and existing under the laws of the State of California.  The

15  Los Angeles Police Department is, and at all times herein alleged, was an agency of

16  the City of Los Angeles.

17      14.    Plaintiff is informed and believes and thereon alleges that Defendants

18  sued herein as Does 1 through 10, inclusive, were employees of the Los Angeles

19  Police Department, and were at all relevant times acting in the course and scope of

20  their employment and agency.  Each Defendant is the agent of the other.  Plaintiff

21  alleges that each of the Defendants named as a "Doe" was in some manner

22  responsible for the acts and omissions alleged herein, and Plaintiff will seek leave of

23  this Court to amend the Complaint to allege such names and responsibility when

24  that information is ascertained.

25              **IV.**

26        **GENERAL ALLEGATIONS**

27      15.    Plaintiff is informed and believes, and thereon alleges, that, at all times

28  herein mentioned, each of the Defendants was the agent and/or employee and/or co-

1  conspirator of each of the remaining Defendants, and in doing the things hereinafter

2  alleged, was acting within the scope of such agency, employment and/or conspiracy,

3  and with the permission and consent of other co-defendants

4      16.    Each paragraph of this Complaint is expressly incorporated into each

5  cause of action which is a part of this Complaint.

6      17.    The acts and omissions of all Defendants were engaged in maliciously,

7  callously, oppressively, wantonly, recklessly, and with deliberate indifference to the

8  rights of Plaintiff.

9                                    **V.**

10                        **FACTUAL ALLEGATIONS**

11  **A.    BACKGROUND**

12      18.    This claim arises from the investigation, prosecution, conviction, and

13  incarceration of Obie Steven Anthony III for crimes that he did not commit.  He was

14  only nineteen years old when arrested.  Mr. Anthony was in custody for over

15  seventeen years, from his arrest on June 25, 1994, to his release on October 4, 2011.

16  Mr. Anthony served all of these seventeen years in custody in maximum security

17  prisons and was therefore subject to the severe limitations and indignities inherent in

18  such settings.  Further, because of his sentence of life without the possibility of

19  parole, Mr. Anthony was subject to even more restrictions and fewer opportunities

20  while in prison.  Mr. Anthony experienced the fear and anxiety of being imprisoned

21  with the State's most serious and violent offenders.  More fundamentally, Mr.

22  Anthony lost his youth and the years during which he would have gone to school,

23  pursued a career, and raised a family.

24      19.    From his arrest and throughout his seventeen years in custody, Mr.

25  Anthony proclaimed his innocence and relentlessly worked to procure his release by

26  showing that a miscarriage of justice occurred.  In pursuit of relief, he filed multiple

27  *pro se* petitions for writs of habeas corpus at all 3 levels of California state court, as

28  well as filed a petition for writ of habeas corpus in federal court, before obtaining

1  pro bono counsel to conduct the investigation and file the successful petition

2  necessary to demonstrate his innocence.  Mr. Anthony refused to accept any plea

3  bargain, always maintaining his innocence.

4        20.     During his time in custody, while working to prove his innocence, Mr.

5  Anthony dedicated his time to improving and educating himself.  He earned his

6  General Educational Development degree (GED), purchased and read self-help

7  books, studied various religions, conducted religious services, learned trades

8  available to him including upholstery, and worked continuously, eventually earning

9  a job as a teacher's aide and then a teacher's clerk.

10       21.     Mr. Anthony's resilience and knowledge that he was innocent allowed

11 him to survive and even be productive while in prison, but tragically, some of the

12 best years of his life were taken from him based on the unconstitutional acts of

13 officers of the Los Angeles Police Department.  He was deprived of the rights and

14 privileges our society holds most dear: freedom, and the ability to raise a family and

15 pursue a career.

16 **B.     INVESTIGATION**

17       22.     The sole evidence against Mr. Anthony and Mr. Cole were three

18 eyewitness identifications provided by John Jones, Arthur Jones and Victor Trejo at

19 trial.  The evidence presented through the 2010-2011 habeas proceedings for Mr.

20 Anthony showed that these eyewitness identifications were the product of improper

21 influence by the LAPD and its detectives which was not disclosed to the defense. As

22 noted by the Superior Court granting the habeas, the case rose and fell with the false

23 testimony of John Jones:

24       "There is no doubt that John Jones was the key witness for the

25       prosecution in this case . . . ,  it all started with John Jones' whisper to

26       Detective Winn – 'Psst, officer, they ran that-a-way.  From that point

27       forward, the detectives built their case around evidence originating

28       from John Jones and this is the evidence that was presented to the

1    jury.'" *In re Obie Anthony*, No. BA097736, Slip Op., at 18 (Sup. Ct.

2    Cal. September 30, 2011).

3         23.    On March 27, 1994, at approximately 11:30 p.m., Felipe Angeles

4    Gonzales, Victor Trejo and Luis Jimenez drove to John Jones's house of prostitution

5    on the corner of 49th Street and Figueroa Street in Los Angeles.  Mr. Gonzales

6    exited the car, went to the front door and asked repeatedly for Melinda.  The

7    gatekeeper to John Jones's operation did not open the door for Mr. Gonzales, but

8    instead told him numerous times that Melinda was busy, and to come back the

9    following day.  As Mr. Gonzales walked back to the car, three or four African-

10   American males approached him and his two friends in the car.  One man pushed

11   Mr. Gonzales up against the back of the car, while another opened the passenger

12   side door, yelled at the Mr. Trejo and Mr. Jimenez to give him their money, and

13   tried to pull Mr. Jimenez out of the car.  When Mr. Trejo touched the man's arm, he

14   began shooting at them, wounding both Mr. Trejo and Mr. Jimenez.  Mr. Trejo

15   drove off after being shot multiple times.  As he was driving away, he saw the men

16   pushing Mr. Gonzales, and then heard more shots as he turned the corner, but did

17   not see what happened.

18        24.    Police found Mr. Gonzales dead at the scene.  He was lying face down

19   on Figueroa Street, near the corner of 49th and Figueroa.  The medical examiner

20   determined that the bullet that killed him had a 40-degree downward angle, and was

21   consistent with a distance shot.  Both Mr. Trejo and Mr. Jimenez were hospitalized

22   for a month for serious gunshot wounds.

23        25.    Homicide detectives Marcella Winn and Peter Razanskas were

24   assigned to the case.  Defendant Winn was the lead on the case, even though she had

25   yet to receive the results from her detective test, was a detective trainee, and had

26   never participated in a homicide investigation prior to this one.  Defendant

27   Razanskas, an experienced homicide detective, was her supervisor on the case.

28        26.    On March 28, 1994, at approximately 4:00 a.m., John Jones called

1 │ down to Defendant Winn and said, "Pssst, they went that-a-way." After Detective

2 │ Winn pleaded with him for a few minutes, John Jones agreed to come down and

3 │ speak to her. When he came downstairs, John Jones told Detective Winn that he

4 │ had seen the entire incident from his window on the second floor. He claimed that

5 │ he had seen a black I-Roc or Camaro drive down 49th Street, make a U-turn and stop

6 │ at the stop sign. He then saw four African-American males, "youngsters," come

7 │ across the street from the auto repair shop toward the car. Suspect one stated, "Give

8 │ me your money, give me all the money, get out of the car." Suspect two said, "Kill

9 │ him, kill him." Suspect one pulled Mr. Gonzales out of the vehicle or grabbed him

10 │ as he was getting in and shot him. Jones then made his presence known by yelling

11 │ at the suspects, at which point suspects one and two began shooting at him. Jones

12 │ described the suspects as follows: Suspect one was 5'7" to 5'8" with very sharp,

13 │ distinguished features and very dark skin. Suspect two had a light complexion with

14 │ short hair. The only information he was able to provide about suspects three and

15 │ four was that they were African-American. At the preliminary hearing, John Jones

16 │ testified that he was not sure whether there were three or four perpetrators and

17 │ thought that the fourth may have been "a dog."

18 │     27.    On March 28, 1994, at approximately 11:30 a.m., Defendants Winn and

19 │ Razanskas returned to John Jones's house of prostitution. John Jones took them up

20 │ on the roof of his building, allegedly to observe the crime scene from above.

21 │ Defendants Winn and Razanskas suppressed the fact that John Jones took them to

22 │ the roof, their belief that he was up on the roof during the shooting, and not on the

23 │ second floor as he claimed, and the reasons for that belief.

24 │     28.    While they were on the roof, Defendant Razanskas collected and

25 │ pocketed some expended bullets. Defendants Winn and Razanskas suppressed the

26 │ fact that there were expended bullets on the roof, and failed to disclose evidence

27 │ indicating that either John Jones or his security fired guns from the roof.

28 │     29.    That same morning, John Jones provided Defendants Winn and

1  Razanskas with the surveillance video from the camera that monitored his front

2  door.  Because the tape showed evidence of his prostitution operation, before

3  handing it over, he had the detectives assure him that they would not use the tape

4  against him.

5       30.    On that tape, one sees Mr. Gonzales approach the door and get sent

6  away, hears the gunshots approximately one minute after he walks away from the

7  door, and then after the shots stop, sees one of John Jones's men pass a gun off to

8  the person behind him and then go outside to view the scene.  The first set of

9  gunshots are rapid fire, but the second set are louder shots from a different gun that

10  are more spaced and deliberate, as if someone was taking aim and firing.

11       31.    When Defendants Winn and Razanskas watched the tape with Jones,

12  they asked him if he had seen a third shooter.  He said no and said that he had told

13  them everything that he knew.  Again, Defendants Winn and Razanskas failed to

14  report this statement, and suppressed that statement throughout the trial, even when

15  Jones testified to the contrary.

16       32.    In fact, the only record of this interaction with John Jones is in

17  Defendant Winn's log and follow-up report, both of which indicate only that John

18  Jones provided the surveillance tape to the detectives that morning.

19       33.    On March 31, 1994, Defendants Winn and Razanskas interviewed John

20  Jones at the police station.  They asked him to come in for an interview because they

21  believed that he was not telling him everything.  According to Defendant Winn's

22  report, during this interview, Jones told them that his girlfriend Carol Canty had

23  alerted him to the robbery going on outside, and that as he was going to the window,

24  gunfire erupted and he heard four shots.  When he looked out the window, he saw a

25  car careening around the corner onto Figueroa Street, and began to "yell" at the

26  occupants of the vehicle because he thought they were doing the shooting.  At that

27  point, he realized he was being shot at from the other direction, turned and saw

28  muzzle flashes from two guns from two men running down 49th Street away from

1   Figueroa and away from him.  "At that time an unk [sic] citizen began to shoot at

2   the guys who were shooting at me.  It appeared as if the guy with the black coat on

3   went down. I know this because I saw the guy in the gray coat help him.  I did not

4   see where the unknown citizen went, or who he is."  Defendant Winn's log is more

5   specific, indicating that John Jones told them that the "unknown citizen shot at

6   suspects possibly wounding S1 in left leg."  Similarly, Defendant Winn's statement

7   of probable cause in support of the search warrant claims that John Jones said that

8   "he knew that the suspect, wearing the black ¾ length jacket, was wounded because

9   he heard him say 'ouch' and he saw him go down."

10      34.      Defendants Winn and Razanskas suppressed the following statements

11   from the interviews of John Jones on March 28 and March 31, 1994: that on March

12   28, 1994, John Jones took the detectives on the roof and denied ever seeing a third

13   shooter; and that on March 31, 1994, he made statements suggesting that he himself

14   was that third shooter.  Specifically, they suppressed that on March 31, John Jones

15   first told the detectives to look into whether one of the shooters had been shot; that

16   in response, Detective Razanskas told Jones that whoever shot at the perpetrators

17   was a hero; that John Jones, a convicted felon, asked, "What if he's an ex-felon with

18   a gun?"; that Detective Razanskas responded the man was a hero to whom he would

19   like to give a medal; that Detective Razanskas further stated that they could refer to

20   this person as the "unknown citizen," and "just leave it at that;" and that John Jones

21   then disclosed that, "the unknown citizen capped off six rounds." It was determined

22   during the 2011 habeas proceedings that John Jones was on the roof, and not in his

23   apartment viewing the shooting from his window.   The Defendants Winn and

24   Razanskas suppressed this fact.  During the 2010-2011 habeas proceedings, it was

25   determined that the location on the roof matched the 40 degree downward angle and

26   location of the body.  Finally, the court found in the habeas proceedings that "there

27   is ample circumstantial evidence to strongly suggest that either John Jones was the

28   so called "third shooter" or knew who that shooter was,"  but as a result of the

1  detectives' misconduct, the jury never heard any of that evidence.

2       35.     Based on John Jones's statements suggesting that he had shot one of

3  the perpetrators in the leg, on March 31, 1994, Defendant Winn issued a medical

4  alert bulletin to area hospitals to watch for a homicide suspect seeking medical

5  treatment for a gun-shot leg injury.

6       36.     In response to the bulletin, Los Angeles County Safety Police Officer

7  Arthur Jones called the detectives and said that on March 30, 1994, a suspect

8  matching the description in the bulletin approached Martin Luther King Hospital

9  and attempted to seek treatment for an injury to his left leg, which was wrapped in

10  white gauze.  The man was limping and needed assistance to walk.  When

11  questioned about the injury, the suspect became agitated and would not answer

12  questions.  The man left without treatment.  Arthur Jones saw two African-

13  American males assist the injured man, and all three left in a late model white

14  Toyota with traffic damage to the right fender.

15       37.     Defendant Winn suppressed the fact that she showed six-pack

16  photospreads with Mr. Cole and Mr. Anthony's photos to Ronald Brock, a safety

17  officer on the scene when the injured man came to the hospital for medical care, in

18  order for him to make an identification.  She also suppressed the identity of Al

19  Wilson, a third safety officer who accompanied Arthur Jones in approaching and

20  questioning the injured man, and the fact that he was a witness, that she showed the

21  six-packs to Al Wilson, and he could not identify Mr. Cole and Mr. Anthony.

22       38.     In the meantime, on April 20, 1994, Michael Miller and Obie Anthony

23  were arrested for an alleged carjacking and kidnapping supposed to have occurred

24  on Century and Figueroa Streets.  On April 21, 1994, Reggie Cole was arrested for

25  the same crimes.  Months later, after this alleged crime made them suspects in the

26  Gonzales murder, the authorities would learn that no carjacking or kidnapping had

27  ever occurred.

28       39.     Defendant Winn claimed that coincidentally, on April 28, 1994, she

1  received an "anonymous tip" from a caller who said that "Baby Day from the Five-

2  Deuce Avalon Crips made a move on 49th Street with two guys, and it went wrong."

3      40.    Defendants Winn and Razanskas claimed to obtain information that

4  "'Baby Day" was Michael Miller, an active 92nd Street Hoover Crip.  Michael

5  Miller's moniker is actually "Baby Day Day."  "Day Day" was a common gang

6  moniker in Los Angeles at the time.  The moniker "Baby Day Day" indicates that

7  person is the third generation of Day Days to join the gang.  There were 14 known

8  Day Day's who were African-American men and active gang members in Los

9  Angeles in 1994.  Presumably, there were at least 14 Baby Day Day's as well, but

10  the Defendants never disclosed the number of Baby Day Day's known to the LAPD,

11  or any of their identities.  Post-conviction habeas investigation revealed that John

12  Jones and his confederates had conducted their own "investigation" and had heard

13  that one of the perpetrators was "Baby Day" from the Five-Deuce Hoover Crips.

14  Mr. Anthony's moniker was in fact "Little Day Day," and at the time of the killing,

15  he was a Nine-Deuce Hoover Crip.

16      41.    In 1994, there was no gang known as the Five-Deuce Avalon Crips.

17  There were other Five-Deuce Crips, such as the Five-Deuce Hoover Crips, but the

18  detectives did not investigate any such gangs, nor did they investigate whether there

19  were any "Baby Day's" or "Baby Day Day's" from any of those gangs.  Instead,

20  they focused their investigation solely on Msrrs. Miller, Anthony and Cole, who

21  were Nine-Deuce Hoover Crips, a different gang from an entirely different area.

22      42.    On April 28, 1994, Defendants Winn and Razanskas found out that

23  Michael Miller and two associates Reggie Cole and Obie Anthony were in custody,

24  having been arrested on April 20, 1994, for a Kidnap/Robbery.  That same day she

25  ordered their booking photos.  The following day, on April 29, Defendants Winn

26  and Razanskas compiled three suggestive six-packs.  They placed Mr. Anthony's

27  photograph in position #1 on card A, Mr. Cole in position #2 on card B, and Mr.

28  Miller in position #3 on card C.  The six-packs were suggestive because John Jones

1 described suspect 1 as light-skinned and bald, and Mr. Anthony stands out in

2 position #1 on Card A as the only person who is light-skinned and bald, especially

3 because the photograph of him appears to be over-exposed and the background is

4 also light. John Jones described suspect 2 as dark-skinned, and Mr. Cole stands out

5 in position #2 on Card B as the most dark-skinned person, especially because the

6 photo appears to be under-exposed even the background of his photograph is the

7 darkest.

8      43.     Although Defendants Winn and Razanskas found out that Carol Canty

9 was a witness when John Jones told them on March 31, 1994, they did not interview

10 her until they showed her the six-packs at 8 a.m. on May 3, 1994. At that time, Ms.

11 Canty circled someone else from the six-pack that included Mr. Anthony's

12 photograph and indicated that he "fits description 70% He was seen brandishing

13 shiny gun on victim and shouting 'Give it up, Give me all your money.' He was

14 wearing a long gray coat, wool like." No reports include any description of the

15 suspects provided by Carol Canty. Nor is there any indication in any report

16 detailing what about the person Ms. Canty chose matched the person she saw and

17 what differed.

18      44.     Defendants Winn and Razanskas next showed the six-packs to John

19 Jones on May 3, 1994. They tapped on the photographs that they wanted him to

20 select. At 8:35 a.m., John Jones selected Reggie Cole from card B and wrote that "if

21 its [sic] not #2, it could be his brother." At 9:45 a.m., John Jones selected Mr.

22 Anthony from card A. The detectives suppressed what was discussed in the hour and

23 ten minutes between John Jones's selection of Mr. Cole and his selection of Mr.

24 Anthony. While showing witness John Jones the six-pack with Mr. Anthony's

25 photo, they improperly and unlawfully influenced the identification by pointing to

26 Mr. Anthony as the perpetrator of the crime. Then, Defendant Winn falsely and

27 erroneously represented in her police report that John Jones independently picked

28 out Mr. Anthony as the perpetrator of the crime. Defendants Winn and Razanskas

1   improperly and unlawfully influenced John Jones' identification by providing him

2   false and misleading information that made him confident that he was selecting the

3   actual perpetrator.  They told him that Mr. Anthony's moniker was "Baby Day," that

4   he and Mr. Cole had been arrested together and were partners, that other people had

5   identified them and Defendants were confident that they had the right men. When

6   they did the live line-up, they told John Jones that Reggie Cole had a gunshot wound

7   on his leg, which made John Jones certain that he had correctly identified both Mr.

8   Anthony and Mr. Cole; told John Jones that one of the men he had identified had

9   also been identified by Arthur Jones, a security guard at Martin Luther King

10  Hospital who had seen the same person approach the hospital with a gunshot wound

11  to the leg.  John Jones never saw the perpetrators well enough to identify them.

12  Defendant Winn concealed the fact that one of John Jones' daughters had seen the

13  events, and Winn testified falsely at trial that the daughter had "seen nothing."

14       45.     After Ms. Canty did not identify their suspects, and while the detectives

15  were unable to locate the victims, John Jones was truly their only witness.

16       46.     Defendants Winn and Razanskas suppressed the facts that they had

17  already applied pressure to John Jones when they told him at the beginning of their

18  investigation that his children could be removed as a result of his criminal activities.

19  This further tainted his identifications of Mr. Anthony and Mr. Cole.  After the

20  detectives illegally influenced and convinced John Jones to identify their suspects

21  and learned that he may be their only witness, their pressure on Jones increased.

22       47.     LAPD officers were aware for years that John Jones was running a

23  prostitution operation in his apartment building.  John Jones pleaded guilty to

24  pandering in 1983, and the probation report from that case indicates that the police

25  had not only received information that Jones was running a sophisticated

26  prostitution operation out of that building, but also sent an undercover officer to the

27  building whom John Jones greeted, discussed how he had multiple prostitutes

28  working for him and arranged for one of the prostitutes to provide services to the

1   officer.  He continued to operate out of that building after his guilty plea.  The 1994

2   probation report indicates that he operated a sophisticated prostitution operation out

3   the building on Figueroa and 49th Streets for 17 years.  However, in contrast to their

4   previous tolerance of Jones' illegal operation, on May 3, 1994, from 5:00 p.m. to

5   9:15 p.m., just hours after John Jones and Carol Canty viewed the six-packs, the 77th

6   Street Vice unit conducted surveillance on John Jones' building, watching

7   prostitutes solicit customers on the street and then bring them into the building while

8   the manager monitored activity from the front doorway. At 10:30 p.m., the officers

9   entered the building and observed prostitutes in various states of undress as well as

10  waiting customers who told them that they were there for sexual services.

11       48.    On May 16, 1994, police executed a search warrant on Jones' building

12  and found evidence throughout the building that it was a sophisticated prostitution

13  operation including a store that sold condoms, food and other supplies for

14  customers, detailed bookkeeping records tracking the women and their business, a

15  .357 Smith & Wesson in John Jones's bedroom, 22 VHS tapes and 65 microcassette

16  tapes.  Although police recovered a .357 Smith & Wesson from John Jones's

17  building, and despite Jones's numerous statements indicating that he fired a gun

18  during the incident, police never compared his gun to the bullet that likely killed Mr.

19  Gonzales.  Felipe Gonzales was killed by a through and through bullet.  Police

20  found a .38 special bullet in the street, in line with Mr. Gonzales's body.  A .357 can

21  fire a .38 special, and the rifling characteristics on the bullet indicated that a few

22  manufacturers made guns, including Smith & Wesson, that could have fired the

23  bullet that killed Mr. Gonzalez.  After the search warrant was executed, John Jones

24  was arrested on a pimping and pandering charges.

25       49.    At 8:25 a.m. on the morning on June 24, 1994, almost three months

26  after he claimed to have seen the men at the hospital, Defendants Winn and

27  Razanskas showed the six-packs to Arthur Jones.  Arthur Jones circled Mr.

28  Anthony's photograph and wrote, "Number one is the one who come [sic] close to

1  look [sic] like subject, who came MLK hospital for medical treatment to left leg he

2  did not receive treatment because he was ask [sic] how did he obtain his injury.  He

3  left location."

4      50.    Arthur Jones' also circled the photograph of someone other than Mr.

5  Cole from card B and wrote, "Number one look's [sic] like subject who was carring

6  [sic] the other subject in to the MLK hospital and the [sic] both left together in a

7  white Toyota."  This information was suppressed by Defendants Winn and

8  Razanskas, and was not revealed until post-conviction proceedings.

9      51.    Further, when Arthur Jones testified at trial that he had not selected

10  anyone other than Mr. Anthony from the six-packs, Detective Winn not only failed

11  to correct this false testimony, but also actually supported it with her own perjured

12  testimony that Arthur Jones had not identified anyone other than his tentative

13  selection of Mr. Anthony as coming close to looking like the injured man.

14      52.    Defendants Winn and Razanskas suppressed other information

15  surrounding Arthur Jones' selections, including that they instructed him to select the

16  photographs that looked closest to the people he had seen.

17      53.    Defendants Winn and Razanskas also showed the six-packs to two

18  other security officers who had seen the men at the hospital, Ronald Brock and Al

19  Wilson.  However, these officers either did not identify Mr. Anthony or Mr. Cole or

20  identified other people, and Defendant Winn failed to mention these facts in any

21  report.

22      54.    When Arthur Jones revealed at trial that he was aware of at least one

23  other person, Ronald Brock, who had viewed the six-packs at the hospital,

24  Defendant Winn attempted to blunt the negative impact of this withheld information

25  by claiming that "Mr. Brock or Brockson" had not been paying attention and had

26  not really seen anything, and that she had only shown him the six-packs to try to

27  refresh his memory.  However, Detective Winn testified years later that she would

28  not show someone a six-pack unless they had indicated that there was a chance they

1  could make an identification.  Further, Arthur Jones has always maintained that the

2  other officers approached and questioned the injured man with him, giving them

3  ample opportunity to view the men and make an identification.  Finally, Detective

4  Winn never revealed that there was a third safety officer, Al Wilson, to whom she

5  had shown the six-packs or the outcome of that identification procedure.

6      55.    On June 24, 1994, at approximately 10:25 p.m., the Defendants Winn

7  and Razanskas showed the six-packs to Luis Jimenez and Victor Trejo.  Mr.

8  Jimenez did not identify anyone.  Victor Trejo circled Mr. Anthony's photograph

9  and wrote that he "looks like the suspect who opened the car door and shot me and

10  Luis."  He explained at the preliminary hearing that he did not believe he was

11  identifying the actual perpetrator, but rather someone who looked like him but was

12  not him.    The June 24 interview is summarized in Defendant Winn's Follow-Up

13  Investigation Report, which does not include any descriptions of the perpetrators.

14      56.    On June 27, 1994, Detective Winn authored a Follow-Up Investigation

15  Report, and also later authored a July 15, 1994 Statement of Probable Cause that she

16  signed under penalty of perjury in request of a Search Warrant for Mr. Cole and Mr.

17  Anthony's residences, their persons to be searched for bullet wounds, and their

18  clothing booked into property when they were arrested.  In these two documents,

19  similar to her suppression of material facts in her March 31, 1994 report, Defendant

20  Winn concealed the following facts: that John Jones provided an initial statement

21  that was a compilation of what others had told him and was completely different

22  than his March 31 statement; that John Jones took the detectives on the roof upon

23  which they saw and collected expended bullets; that John Jones denied seeing or

24  knowing anything about a third shooter prior to disclosing that someone had fired at

25  the two shooters; John Jones's statements suggesting that he is the "unknown

26  citizen" who fired a gun during the incident; any of the statements or actions that

27  made the detectives suspect that John Jones was on the roof during the incident and

28  was the "unknown citizen"; the fact that John Jones was running a house of

1  prostitution and had been recently arrested for pimping and pandering; and Arthur

2  Jones' identification of a filler; that two additional safety Police Officers had not

3  identified either Mr. Anthony or Mr. Cole ; and all of the statements Defendants had

4  made and actions they had taken to improperly influence the identifications.

5        57.     Detective Winn wrote in the Statement of Probable Cause for the

6  Search Warrant that she expected to find weapons, clothing, shoes and other

7  miscellaneous items to connect Mr. Anthony and Mr. Cole to the crime.  However,

8  the search warrant, which was executed on or about July 20, 1994, revealed no such

9  items.  Instead, the detectives confiscated shoes that did not match the fresh

10  shoeprints they had photographed from the crime scene.  They found that the

11  clothing booked into property did not match the descriptions of the clothing they

12  had received from witnesses.  They learned that neither Mr. Anthony, nor Mr.

13  Cole's fingerprints, matched the 11 usable fingerprints recovered from the victim's

14  car after the victims had been excluded.  The detectives did find a healed bullet

15  wound on Reggie Cole's leg, only to later learn, that Mr. Cole's medical records

16  demonstrated that Mr. Cole received that wound when he was 12 years old,

17  approximately six years before this crime occurred, in a different state.  Still the

18  detectives never even looked into whether someone else committed this crime.

19        58.     On August 11, 1994, live lineups with Mr. Anthony and Mr. Cole were

20  conducted.  John Jones identified both men.  Carol Canty did not attend the lineup.

21  Arthur Jones left blank the location to indicate who the suspect was for Mr.

22  Anthony's lineup, and in remarks wrote that Mr. Anthony "look [sic] like suspect he

23  had curly hair/or jerry curl."  He selected Mr. Cole from the second lineup and

24  wrote, "number five but his hair was cut close to his head."  Luis Jimenez did not

25  identify anyone.  Victor Trejo did not select anyone from Mr. Anthony's lineup, and

26  selected a filler from Mr. Cole's lineup.

27        59.     Other than the testimony of the three eyewitnesses whose

28  identifications were the by-product of illegal conduct by Defendants Winn and

1   Razanskas, there was no other evidence linking them to the murder.  Indeed, the

2   affirmative evidence, the 11 usable fingerprints, the shoe prints, and the bullet

3   wound showed they did not commit the crime, and the Defendants deliberately

4   ignored this affirmative evidence pointing to Mr. Cole and Mr. Anthony's

5   innocence.

6       60.     Based on Defendant Winn's Follow-Up Investigation Report and

7   presentation of the case, on June 28, 1994, Deputy District Attorney Liz Ratinoff

8   filed charges against Mr. Anthony and Mr. Cole alleging one count of murder with

9   special allegations, three counts of attempted murder, and two counts of attempted

10  robbery.

11  **C.    SUPERIOR COURT PROCEEDINGS**

12      61.     In presenting the case to the District Attorney, for filing, Defendant

13  Detective Winn did not provide any information about: the fact and identity of

14  witnesses who had not identified Mr. Anthony or Mr. Cole; the fact that Arthur

15  Jones had identified a filler; John Jones' initial statement that was based on a

16  compilation of information from other people; their theory that John Jones was on

17  the roof during the shooting and the reasons for that theory;  John Jones' initial

18  denial of seeing or knowing anything about a third shooter, his subsequent

19  statements implying that he was that third shooter, and  her suspicion that he was the

20  third shooter; John Jones' pending charges for pimping and pandering and his prior

21  convictions for manslaughter and pandering in the same building; or any of the

22  statements and actions Defendant Detectives made to improperly influence the

23  identifications.

24      62.     At the preliminary hearing on September 12, 1994, two months after

25  detectives found the bullet wound in Mr. Cole's leg, Arthur Jones switched his

26  tentative selection of Mr. Anthony as coming closest to looking like the injured man

27  to a positive identification of Mr. Cole as the injured man and a positive   .

28  identification of Mr. Anthony as the person who had assisted him.  In the 2010-2011

1 | post-conviction habeas proceeding, it was stipulated that if called as a witness,
2 | Arthur Jones would have testified in conformance with his testimony at Mr. Cole's
3 | motion to strike.  At the motion to strike hearing, he testified that the detectives told
4 | him prior to his testimony that they had caught the perpetrators and had a case, and
5 | that one of the men he had identified at the live lineup had been shot in the leg.
6 | Defendants Winn and Razanskas suppressed this information at the preliminary
7 | hearing and trial.

8 |      63.     At the trial that commenced on July 13, 1995, Victor Trejo identified
9 | Mr. Anthony as the man who shot him and Luis Jimenez.  He admitted that he had
10 | his doubts about Mr. Anthony when first shown the six-pack photospread with Mr.
11 | Anthony's photo and did not believe at that time that he was selecting the actual
12 | perpetrator but rather someone who looked like him; that he could not identify Mr.
13 | Anthony at the live line-up; that he had admitted at the preliminary hearing that he
14 | never really got a good look at Mr. Anthony; and that the photograph of Mr.
15 | Anthony had helped him to remember and he subsequently saw Mr. Anthony in his
16 | dreams, which is how he was able to identify him in court.  He failed to mention that
17 | prior to identifying Mr. Anthony at the preliminary hearing, the Defendants, Winn
18 | and Razanskas, fed him information that they had caught the men who had shot him
19 | and killed his friend.

20 |      64.     Carol Canty, John Jones' common-law wife, testified that on the night
21 | of the shooting, she heard noises outside her window, looked out and saw a man
22 | standing on the passenger side of the car, stick a gun inside the window of the car.
23 | She saw another man who was bald waving a gun at people, telling them to "give it
24 | up, give me the money."  She did not identify Mr. Anthony at trial, and admitted
25 | that she picked another man in the six-pack photospread with Mr. Anthony's photo,
26 | and stated that at the  time she selected the photo she was 70% sure she picked the
27 | correct person.

28 |      65.     The medical examiner testified at trial that Mr. Gonzalez died of a

1   through-and-through gunshot wound to the back.   The trajectory of the bullet was

2   from the right side to his left side downward at 40 degrees.   The medical examiner

3   further found that the fatal wound was consistent with a distant shot.  At the 2010-

4   2011 habeas proceedings, it was stipulated by the parties that expert testimony

5   would establish that a shot from the roof of John Jones' apartment building was

6   consistent with a 40 degree downward angle.

7        66.    John Jones also identified Obie Anthony at trial.  He testified that on

8   the night of the murder, Mr. Anthony looked at him right in the eyes although when

9   he first spoke to police he described the suspect he later identified as Mr. Anthony

10   as having "unknown eyes."  He further testified that he saw Mr. Anthony when he

11   was 30 to 40 feet away, running down a dark street away from John Jones, and only

12   saw his face when he allegedly spun around to shoot at John Jones while continuing

13   to run away.  Although the police found bullet casings at the crime scene, they

14   found none in the area from which Jones claimed the perpetrators shot at him.

15        67.    Arthur Jones testified at trial and identified Mr. Anthony as the man

16   who came to Martin Luther King Hospital assisting the injured man.  This was after

17   he first said when shown the six-pack photo spread that Mr. Anthony came closest

18   to looking like the subject who came to the hospital with an injury to his left leg, but

19   then switched his identification at the preliminary hearing to indicate that Mr.

20   Anthony assisted the man with the injury to his left leg, after Defendants Winn and

21   Razanskas determined that it was Mr. Cole that had a bullet wound to his left leg.

22   Defendants Winn and Razanskas concealed the fact that Arthur Jones'

23   identifications of Mr. Cole and Mr. Anthony were the product of undue influence by

24   them, and were inherently unreliable:  they concealed the fact that Arthur Jones

25   identified someone else other than Mr. Cole as the person who assisted the injured

26   man [now Mr. Anthony at trial] when shown the six-pack; Defendant Winn

27   compounded this material concealment by falsely testifying that Arthur Jones had

28   not identified anyone other than his tentative selection of Mr. Anthony as coming

1 closest to looking like the injured man; and Defendants Winn and Razanskas

2 concealed the fact that they instructed him to select photos that looked closest to the

3 persons who came to the hospital, not the persons who he actually saw.

4      68.      In the defense case for Mr. Cole and Mr. Anthony, an eyewitness

5 identification expert, Kathy Pezdek, Ph.D., testified as to factors that could affect

6 the reliability of the eyewitness identifications by Victor Trejo, Arthur Jones and

7 John Jones.  These factors included alcohol consumption, lengthy delay between the

8 crime and viewing the six-pack photospreads, distractions, stress, weapons focus,

9 limited viewing time, and lighting and physical distance.  Noticeably absent from

10 Dr. Pezdek's testimony was the unlawful and unconstitutional conduct, discussed

11 above, by Defendants Winn and Razanskas that tainted the identifications, including

12 tapping on the photos of Mr. Cole and Mr. Anthony when showing John Jones the

13 six-packs, and feeding the eyewitnesses information about the crime and the

14 suspects that would ensure positive identifications, because the Defendants

15 suppressed that information.

16      69.      Mr. Cole also presented alibi witnesses who testified that Mr. Cole was

17 home at the time the crime was committed.

18      70.      Mr. Anthony testified that he had nothing to do with the crime, that he

19 was home at the time of the murder, and called three alibi witnesses who testified

20 that he was at home at the time the crime was committed.

21      71.      Based on the false and tainted eyewitness testimony of John Jones,

22 Arthur Jones and Victor Trejo, Mr. Anthony and Mr. Cole were wrongfully tried

23 and convicted.

24 //

25 //

26

27

28

**D. JOHN JONES COMMITTED PERJURY AT THE PRELIMINARY HEARING AND TRIAL, AND DEFENDANTS, ALTHOUGH AWARE OF IT, NEVER ADVISED THE DISTRICT ATTORNEY OF THE FACT.**

72.     From the very moment that John Jones was arrested on pimping and pandering charges in May 1994, he sought the assistance of Defendant Winn to procure some kind of deal or help with his case.  Defendants Winn and Ranzanskas procured a deal for John Jones in exchange for his testimony against Mr. Cole and Mr. Anthony, but concealed the deal, and allowed John Jones to testify falsely that he did not receive any benefits for testifying against Mr. Cole and Mr. Anthony, and did not correct John Jones' perjurious testimony that he did not receive any benefits for his testimony.

73.     Only during the post-conviction habeas investigation, it was learned that the deputy district attorney's initial offer to John Jones after his May 1994 arrest, and prior to June 8, 1994, was six years in state prison.  The habeas proceedings further revealed that on July 21, 1994, Defendant Winn called the Los Angeles Deputy District Attorney prosecuting John Jones, and indicated that, "D is a witness in a 187 and a V on a 664/187.  He has assisted in other 187's.  She wants to recommend leniency on this case.  I told her Capt. had to take write a letter to Bill Hodgman addressing these issues.  She will take care of it."  John Jones' attorney called the Jones deputy district attorney on July 25, 1994, stating that John Jones "is an informant for LAPD."

74.     On August 17, 1994, John Jones' counsel told the deputy district attorney that he was continuing to check "with Det re use of D as a snitch" and understood that the agreement would have to be approved by the then-District Attorney Gil Garcetti.  The notes indicate that Detective Winn continued to work with John Jones' attorney to procure a deal for him.

75.     On September 8, 1994, just 4 days before the September 12, 1994

preliminary hearing, Defendant Winn procured a letter, following the very

procedure outlined by the Jones' deputy district attorney, to have her captain write a

letter to obtain "leniency." Defendant Winn's letter, signed by Martin Pomeroy,

Acting Director Office of Operations, Los Angeles Police Department, requested a

deal for Jones in exchange for his testifying against Mr. Cole and Mr. Anthony:

> "On September 9, 1994, John Jones is to appear . . . (Case No. BA096384).
> Mr. Jones was arrested for pimping and pandering by vice officers of this
> Department.
>
> Prior to and after his arrest in May 1994, Mr. Jones has been supplying
> information to the detectives of South Bureau Homicide.  This information has
> lead to the arrest of two persons for murder.
>
> Additionally, he has provided the identity of other suspects involved in
> ongoing homicide investigations.   Mr. Jones is scheduled to appear in the
> preliminary hearing of these two individuals on September 12, 1994.
>
> In view of Mr. Jones' cooperation, it is requested that he be given special
> consideration at the time of sentencing and be placed on probation.  If you
> desire any further information, please contact Detective Marcella Winn, South
> Bureau Homicide . . . ."

76.     At the preliminary hearing, John Jones identified Mr. Cole and Mr.

Anthony as the perpetrators of the crime.  Between the preliminary hearing and the

trial, a second letter was written on October 12, 1994, and signed by Larry Goebel,

Commanding Officer of the 77th Street Police Station.  The letter states that it was

his "understanding that Mr. Jones is the only witness in a homicide case that

Operations-South Bureau Homicide is handling," and that 77th Street Vice [the

division that arrested Jones on the pandering charge], "concurs with the Office of

the Chief of Police in this matter, and will cooperate fully with the Los Angeles

District Attorney's office."  On November 8, 1994, shortly after this letter, John

Jones pled guilty to Count 1, which carried a term of 3, 4 or 5 years, and with his

1   prior strike, was to be doubled in length.  He was allowed to plead to pimping, count

2   1, instead of count 2, pandering, or running a house of prostitution.  On the record

3   the Jones court states that John Jones will be put on probation, and asks whether

4   anyone promised him anything **other than what we talked about this morning** to

5   get you to plead guilty. [emphasis added]."

6        77.    The Jones deputy district attorney notes of December 8, 1994 indicate

7   that John Jones is a snitch, and the judge sentencing him asked whether he should be

8   sentenced before or after his testifying in the murder trial.  On January 24, 1995, the

9   Jones deputy district attorney wrote a disposition report, stating that John Jones has

10   a prior for pandering, "[h]owever since his arrest he has given information and

11   testified in 2 murder cases which resulted in the convictions of two people for

12   murder.  The LAPD has written letters requesting these factors be considered in a

13   dispo of this case.  Therefore it was agreed to strike the prior and take a plea to 266f

14   for probation."  Without the prior being struck, Jones faced 14 years and 8 months

15   in prison.  The probation report prepared for him recommended the high end of the

16   pimping charge, count 1, and if he received the strike, he would have received 12

17   years.

18        78.    On January 24, 1995, with his testimony already locked in for trial,

19   John Jones was sentenced to probation.  As the Court stated in the 2010-11 habeas

20   proceedings, John Jones received a "quid pro quo" for his testimony against Mr.

21   Anthony, and this deal was concealed from the defense at trial.  Defendants Winn

22   and Razanskas procured this deal for John Jones; concealed it from Mr. Anthony's

23   defense during the murder trial; allowed John Jones to perjure himself about the

24   deal; and Defendant Winn covered-up the benefit she obtained for John Jones in her

25   own testimony.  Probation was a clear benefit; John Jones avoided not only many

26   years of state prison, but also jail time.

27        79.    During the trial, in July 1995,  John Jones testified as follows:

28       "Q.  DID YOU RECEIVE SPECIAL TREATMENT?"

1  "A. WHAT DO YOU MEAN SPECIAL TREATMENT?"

2  "Q. DID YOU RECEIVE SPECIAL TREATMENT?"

3  "A. I WAS ARRESTED, HAULED INTO COURT. NO."

4   80. Defendant Winn was present throughout John Jones' testimony, and

5 made no effort to correct his perjurious testimony, even though she knew he

6 received a deal and avoided substantial state prison time.  With regard to seeking

7 help, John Jones further perjured himself by testifying that his cooperation had

8 nothing to do with getting less time, and that he was told by Detective Winn she

9 could not do anything for him:

10  "Q. NEVER ASKED FOR ANY HELP?"

11  "A. YES.  I ASKED FOR HELP.  THEY TOLD ME IT WASN'T THEIR

12  DEPARTMENT AND THERE WASN'T ANYTHING THEY COULD DO."

13  "Q. WHO DID YOU ASK FOR HELP?"

14  "A. DETECTIVE WINN."

15   81. This testimony was false and Defendant Winn allowed this perjured

16 testimony to go uncorrected.  John Jones knew in his case he was receiving a deal,

17 and Defendants Winn and Razankas made sure he got a deal for his testimony.  The

18 testimony was important:  In closing argument, the prosecution argued that

19 probation was routine for his conviction, and that John Jones was not receiving a

20 benefit:

21  "IS HE A SNITCH WHEN HE SIMPLY DESCRIBED TO THE POLICE

22  WHAT HE SAW AND THE FACT OF THE MATTER IS THAT [the

23  defense attorney's] ARTICULATE AND PERSUASIVE ARGUMENT

24  THAT HE'S TRYING TO HELP HIS CASE OR GET A REWARD, WHEN

25  YOU TEST IT WITH THE FACTS, IS NOT TRUE."

26   82. Defendants Winn and Razanskas failed to correct this argument by the

27 district attorney that John Jones was not getting a benefit for his testimony.

28 John Jones has admitted post-conviction that (1) he knew he was under police

scrutiny during the entire investigation of the murder case; (2) that he was charged to ensure that he would be in court to testify against Mr. Anthony; and (3) that he knew if he cooperated with the police, he would not go to prison, despite the elaborate nature of his criminal prostitution enterprise. ["'y'all sicked vice on me to make sure I come to court . . . and I knew Raz [defendant Razanskas] wasn't going to let me go down, but he wanted to make sure I was in court."]

83.     John Jones testified at the trial that he managed a building and rented rooms, mostly to transients, and charged tenants visitor fees. He testified that he gave rebates on those fees, which is what technically made him guilty of pandering, and that he was not running a house of prostitution. Defendants Winn and Ranzanskas well knew that he was running a house of prostitution, and allowed him to testify falsely about his bordello, described by the probation department who wrote that his was a "sophisticated prostitution operation" run out of his building for 17 years.

84.     John Jones testified falsely that he viewed the crime from a window on the second floor, not from the roof, even though he had taken the detectives up on the roof, showed them his vantage point from the roof and when they left, Defendant Razanskas said, "He was up on that roof the whole time." Still, Defendants Winn and Razanskas allowed John Jones to testify falsely that he was on the second floor when he viewed the crime.

85.     At trial, Jones denied doing the shooting the night of the murder. He denied knowing the shooter. He denied that the police told him that as far as they were concerned the guy who was shooting was like a hero, and he could stay unknown. He claimed that the detectives had "grilled him" about the identity of the third shooter. Defendant Winn failed to correct this false testimony at trial.

86.     Even John Jones, although denying that he denied received any kind of deal or assistance at trial, revealed post-conviction that he knew the detectives had him arrested and charged to put pressure on him, and that if he continued to

1  cooperate, they would not let him "go down" or serve any jail or prison time.

2       87.    On August 2, 1995, both Reggie Cole and Mr. Anthony were convicted

3  of first-degree murder and special circumstances.  Subsequently, the Superior Court

4  sentenced both men to life imprisonment without the possibility of parole.  Mr.

5  Anthony was incarcerated on the charges on June 28, 1994, and remained in custody

6  until October 4, 2011, the date he was discharged after his habeas petition was

7  granted on September 30, 2011.

8  **E.    AS A RESULT OF THE CITY OF LOS ANGELES POLICE**

9  **DEPARTMENT POLICIES, CUSTOMS AND PRACTICES VIOLATING**

10 **THE RIGHT TO BE FREE FROM IMPROPER AND SUGGESTIVE**

11 **EYEWITNESS IDENTIFICATIONS, AND POLICIES, CUSTOMS AND**

12 **PROCEDURES VIOLATING DEFENDANT'S RIGHT TO EXCULPATORY**

13 **INFORMATION, SUGGESTIVE EYEWITNESS IDENTIFICATION**

14 **PROCEDURES WERE EMPLOYED WITH EYEWITNESSES AND**

15 **DEFENDANTS WINN AND RAZANSKAS CONCEALED FROM THE**

16 **DEPUTY DISTRICT ATTORNEY AND THE DEFENSE JOHN JONES'**

17 **STATUS AS AN INFORMANT AND BENEFITS HE RECEIVED IN HIS**

18 **OWN CASE**

19      88.    Plaintiff is informed and believes that the Los Angeles Police

20 Department had no established or clear policy regarding the following issues

21 pertaining to informants: a) maintaining files and information regarding informants,

22 and benefits offered to or received by informants; b) ensuring that information

23 regarding benefits offered to or received by informants was provided to the

24 prosecutor(s) in the case in which the informant was to testify; c) fully and

25 completely documenting police personnel's interactions with informants; d)

26 ensuring that the information and testimony provided by informants was reliable; e)

27 ensuring that, whether through inadvertence or design, police personnel did not

28 provide information to informants in a manner that suggested the provision of

1 answers for which they were looking; f) training police personnel in the provision of

2 informant benefit information to the prosecutor(s) in the case in which the informant

3 was to testify; and g) supervising police personnel in the provision of informant

4 benefit information to the prosecutor(s) in the case in which the informant was to

5 testify.

6        89.     Plaintiff is informed and believes that to the extent that the Los Angeles

7 Police Department had policies regarding the issues set out in the foregoing

8 paragraph, the policies were not known to or implemented by police personnel in

9 cases in which an informant received benefits and testified in a case.  Not only were

10 any such titular policies not implemented or followed, but the Los Angeles Police

11 Department had a custom and practice of a) not maintaining files and information

12 regarding informants, and benefits offered to or received by informants; b) failing to

13 ensure that information regarding benefits offered to or received by informants, was

14 provided to the prosecutor(s) in the case in which the informant was to testify; c)

15 fully and completely documenting police personnel's interactions with informants;

16 d) failing to ensure that the information and testimony provided by informants was

17 reliable; e) failing to ensure that , whether through inadvertence or design, police

18 personnel did not provide information to informants in a manner that suggested the

19 provision of answers for which they were looking; f) failing to properly or

20 adequately train police personnel in the provision of informant benefit information

21 to the prosecutor(s) in the case in which the informant was to testify; and g) failing

22 to properly or adequately supervise police personnel in the provision of informant

23 benefit information to the prosecutor(s) in the case in which the informant was to

24 testify.

25        90.     Because the policies, practices and customs set forth in the preceding

26 two paragraphs meant that certain exculpatory, material information did not reach

27 the prosecutors handling the case regarding which the information was exculpatory,

28 it did not reach the defendants who needed the information in order to defend

PLF'S COMPLAINT

30

1   themselves, thereby depriving them of a fair trial.

2        91.    In addition, Plaintiff is informed and believes that the Los Angeles

3   Police Department had no established or clear policy regarding the following issues

4   pertaining to eyewitness identification: a) ensuring that eyewitness identification

5   procedures complied with the requirements of due process, including those set out in

6   *Manson v. Braithwaite, 432 U.S. 98, (1977)* and *Neil v. Biggers, 409 U.S. 188*

7   *(1972)*; b) ensuring that police personnel, whether through inadvertence or design,

8   did not provide information to potential eyewitnesses that influenced the

9   identification; c) fully and completely documenting police personnel's interactions

10   with eyewitnesses; d) training police personnel to provide to the prosecutor

11   eyewitness identification information that is exculpatory in the case in which the

12   eyewitness was making an identification; and e) supervising police personnel in the

13   provision of exculpatory eyewitness identification information to the prosecutor(s)

14   in the case in which the eyewitness was making an identification.

15        92.    Plaintiff is informed and believes that to the extent that the Los Angeles

16   Police Department had policies regarding the issues set out in the foregoing

17   paragraph, the policies were not implemented by police personnel in cases in which

18   an eyewitness was used.  Not only were no such titular policies implemented or

19   followed, but the Los Angeles Police Department had a custom and practice of a)

20   failing to ensure that eyewitness identification procedures complied with the

21   requirements of due process, including those set out in *Manson v. Braithwaite* and

22   *Neil v. Biggers*; b) failing to ensure that police personnel, whether through

23   inadvertence or design, did not provide information to potential eyewitnesses that

24   influenced the identification; c) failing to ensure that police personnel fully and

25   completely documented their interactions with eyewitnesses; d) failing to properly

26   or adequately train police personnel in the provision of eyewitness identification

27   information that is exculpatory to the prosecutor(s) in the case in which the

28   eyewitness was making an identification; and g) failing to properly or adequately

1 | supervise police personnel in the provision of eyewitness identification information
2 | that is exculpatory to the prosecutor(s) in the case in which in which the eyewitness
3 | was making an identification.

4 | 93.   The actions and inactions of the Los Angeles Police Department set
5 | forth in the preceding five paragraphs were known or should have been known to
6 | the policy makers responsible for the Los Angeles Police Department and occurred
7 | with deliberate indifference to either the recurring constitutional violations
8 | elaborated above, and or to the strong likelihood that constitutional rights would be
9 | violated as a result of failing to train, supervise or discipline in areas where the need
10 | for such training was obvious.

11 | 94.   The actions and omissions of the Los Angeles Police Department set
12 | forth in the preceding six paragraphs were a motivating force behind the violations
13 | of Mr. Anthony's constitutional rights as set forth in this complaint.

14 | 95.   In 1989-1990, the Los Angeles County Grand Jury reviewed evidence
15 | that the Los Angeles County District Attorney's Office and law enforcement
16 | throughout Southern California, including the City of Los Angeles Police
17 | Department, were in the practice of using informants to obtain false and fabricated
18 | confessions of criminal defendants. The pervasive use of these informants put in
19 | doubt many of the convictions obtained by the Los Angeles County District
20 | Attorney's Office.  The period of inquiry by the Grand Jury spans from
21 | approximately 1979 to 1990, although there are references to convictions as early as
22 | 1976.

23 | 96.   Defendant City of Los Angeles had a duty to create a system in which
24 | information pertaining to informants, including John Jones, would be disseminated
25 | to deputy district attorneys prosecuting cases in which the informant was to testify.
26 | Deputy District Attorneys Robert Grace and George Castello prosecuted Mr.
27 | Anthony' s preliminary hearing and trial.  The City of Los Angeles' failure to do so
28 | resulted in the Anthony case prosecutors, and in turn the Anthony defense, having

1  no access to any impeachment information including benefits provided to John

2  Jones prior to Mr. Anthony's conviction.

3      97.    Plaintiff is informed and believes that based on the City's failure to

4  create a system in which information pertaining to informants would be shared

5  among personnel, would be able to be accessed by personnel, and would be shared

6  with Deputy District Attorneys prosecuting the case in which the informant was to

7  testify, and the failure to train police personnel to disseminate information

8  pertaining to informants, the City of Los Angeles had a pattern and practice of

9  permitting informants to testify falsely at trial that they were receiving little or no

10 benefits for their testimony, when in truth and fact, these informants were receiving

11 extensive benefits for their testimony and they were committing perjury through

12 such testimony.

13      98.    Plaintiff is informed and believes that based on the City's failure to

14 create a system in which information pertaining to informants would be provided to

15 Deputy District Attorneys prosecuting the case in which the informant was to

16 testify, and their failure to train and supervise police personnel to disseminate

17 information pertaining to informants to Deputy District Attorneys prosecuting the

18 case in which the informant was to testify, the City of Los Angeles had a pattern and

19 practice of using unreliable testimony of informants to secure criminal convictions,

20 knowing that such testimony was false, or made in reckless disregard to the falsity

21 of the informant's testimony.

22 **F.    MR. ANTHONY'S PETITION FOR WRIT OF HABEAS CORPUS**

23      99.    From August 30, 2011, to September 14, 2011, the Los Angeles

24 Superior Court held an evidentiary hearing with regard to Mr. Anthony's petition for

25 writ of habeas corpus.

26      100.   During that hearing, John Jones admitted that he relied more on

27 information others relayed to him than what he had seen to make his identifications.

28 The detectives provided him with information that made him confident in his

1  selections.  He knew that if he cooperated against Mr. Anthony and Mr. Cole, the

2  detectives would make sure he did not go to prison for the pimping and pandering

3  case, which he believed was brought only to put pressure on him to testify.  He

4  testified at the hearing that much of what he had testified to at trial was neither

5  accurate, nor true.

6      101.    John Jones admitted at the hearing that he had taken the detectives up

7  on his roof to view the scene.  He also testified that when initially talking about the

8  third shooter or "unknown citizen," the detectives told him that person was a hero.

9  He asked them, "What if he's an ex-felon with a gun?" and after being assured again

10 that this person was a hero, said something about how the unknown citizen had

11 capped off six rounds.

12     102.    John Jones testified that he had told the detectives that his initial

13 descriptions were compilations of what others had told him, and that he had not

14 personally seen much of what he had described in his first interview.  Specifically,

15 much of the information had come from his daughters, but he only agreed to testify

16 on condition that the detectives would keep his daughters out of the proceedings.

17     103.    Angela Jones, John Jones' daughter, testified that after seeing the initial

18 altercation outside of her bedroom window, she went to tell her father what was

19 happening.  Her father headed toward the stairwell that went up to the roof, and she

20 heard him on the roof during the time the shots were fired.

21     104.    TJ Jones, Angela's sister, testified that she watched the initial

22 altercation until she heard something that indicated to her the men were going to

23 start shooting, at which point she got down on the ground.  She looked out the

24 window again after the shooting stopped.  She described to her father what she had

25 seen.

26     105.    Investigator Deborah Crawford testified that John Jones demonstrated

27 to her how Detective Winn had tapped on Mr. Anthony's photograph as she slid the

28 six-pack toward him.  She also testified that Angela Jones had described seeing her

1    father with guns all of the time, and also disclosed that her father's favored shooting
2    location was the roof of their apartment building.

3        106.    The parties stipulated that if called to testify, George Michael Newman
4    would have testified in conformance with his testimony at Mr. Cole's motion to
5    strike. There, Mr. Newman testified that John Jones told him that when Detective
6    Winn presented the six-packs, she indicated which photograph she expected him to
7    identify tapping her finger on a specific photograph.

8        107.    The parties stipulated that if called to testify, then-deputy district
9    attorney Ken Wullshleger would have testified that John Jones received a "really
10   good" deal, and his case was not "routine."

11       108.    Isaac Gaston described John Jones' security practices, including
12   placing armed security guards on the roof at night, Jones carrying a .357 and going
13   up on the roof himself.

14       109.    Defendant Winn admitted to failing to report statements from John
15   Jones that implied that he was the "unknown citizen" shooter, facts suggesting that
16   he was on the roof during the incident and not in his bathroom window as he
17   claimed at trial, and numerous statements bearing on Jones' credibility.

18       110.    Tom Streed, an ex-homicide detective from San Diego, testified that if
19   John Jones had been on the roof as opposed to the second story window as he
20   claimed at trial, he would have been viewing the perpetrators from a greater distance
21   and at an angle that would have impaired his view of their facial features. Further,
22   firing a gun at night causes momentary blindness, and because Jones only saw the
23   perpetrators for a few seconds at most, firing shots could have greatly affected his
24   ability to see anything at all.

25       111.    Luis Jimenez, a surviving victim, testified that the actual perpetrators
26   were 30-35 years old, "not teenagers," while Mr. Anthony and Mr. Cole were 19
27   and 18 respectively at the time. He also testified that prior to the preliminary
28   hearing, the detectives told Victor Trejo that they had caught the men who had shot

1  them and killed their friend, giving Mr. Trejo every reason to identify the two men

2  sitting at the defense table in orange jumpsuits.

3      112.   The parties stipulated that if called to testify, Arthur Jones would have

4  testified in conformance with his Imperial County testimony at Mr. Cole's motion to

5  strike (see below §G).  There, Arthur Jones testified that when asking him to make

6  identifications, the detectives told him that they had had made arrests and had a

7  case.  They further told him that one of the people he had identified had a gunshot

8  wound to his leg.  Arthur Jones also testified that Al Wilson, Ronald Brock, and a

9  nurse were with him when he approached the injured man.  The detectives showed

10  the six-packs to Al Wilson and Ronald Brock.  Mr. Wilson and Mr. Brock told

11  Arthur Jones that they could have identified the people they had seen.

12      113.   The parties stipulated that the dispatch records show that 5:46 am on

13  March 28, the morning after the murder, police took a suspect into custody.  Current

14  LAPD records indicate they have no record of this incident in their files.

15      114.   After hearing the testimony at the state court evidentiary hearing, the

16  Honorable Kelvin D. Filer, Los Angeles Superior Court, vacated Mr. Anthony's

17  conviction in a lengthy written Findings of Fact and Conclusions of Law.

18      115.   Ultimately Mr. Anthony was not re-tried.  Accordingly, he is an

19  innocent man as a matter of law.  When Mr. Anthony was released from the custody

20  of Defendant County of Los Angeles on October 4, 2011, he had been wrongfully

21  and continuously held in custody since his arrest in July 1994, over seventeen years.

22  On November 18, 2011, the Los Angeles District Attorney's Office dismissed the

23  charges against Mr. Anthony.

24  **G.    MR. COLE'S PETITION FOR WRIT OF HABEAS CORPUS AND**

25  **MOTION TO STRIKE PRIOR**

26      116.   Mr. Anthony's co-defendant, Reggie Cole, was also wrongfully

27  incarcerated, and after separate proceedings, on April 15, 2009, his habeas petition

28  was granted in Los Angeles Superior Court Case No. BA097736.  On July 2, 2010,

1 | the Los Angeles District Attorney's Office dismissed the charges against Mr. Cole.

2 |     117.   Mr. Cole's habeas petition was filed after he had been charged in an

3 | unrelated case during which he litigated a Motion to Strike the prior conviction that

4 | is the subject of this lawsuit.  A Superior Court in Imperial County held a full

5 | evidentiary hearing on the motion to strike, at which many witnesses testified.

6 | Much of the evidence from that hearing called into question Mr. Cole's and Mr.

7 | Anthony's convictions, resulted in striking the prior, and led to further investigation

8 | and the successful habeas petitions.

9 | **H.**    **PARTICIPATION, STATE OF MIND AND DAMAGES**

10 |     118.   All Defendants acted without authorization of law.

11 |     119.   Each Defendant participated in the violations alleged herein, or directed

12 | the violations alleged herein, or knew of the violations alleged herein and failed to

13 | act to prevent them.  Each defendant ratified, approved and acquiesced in the

14 | violations alleged herein.

15 |     120.   As joint actors with joint obligations, each defendant was and is

16 | responsible for the failures and omissions of the other.

17 |     121.   Each Defendant acted individually and in concert with the other

18 | Defendants and others not named in violating Plaintiff's rights.

19 |     122.   Each Defendant acted with a deliberate indifference to or reckless

20 | disregard for an accused's rights for the truth in withholding evidence from

21 | prosecutors, and/or for the Plaintiff's right to an eyewitness identification free from

22 | improper suggestion, for an investigation free of active concealment of material

23 | facts, and/or for the Plaintiff's right to due process of law.

24 |     123.   As a direct and proximate result of the aforesaid acts, omissions,

25 | customs, practices, policies and decisions of the Defendants, Plaintiff has suffered

26 | great mental and physical pain, suffering, anguish, fright, nervousness, anxiety,

27 | shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension,

28 | which have caused Plaintiff to sustain damages in a sum to be determined at trial.

124.   Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury.  For such injury, Plaintiff will incur significant damages based on psychological and medical care.

125.   As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

126.   As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to get married and raise a family.

127.   The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiff, entitling Plaintiff to exemplary and punitive damages from each defendant other than Defendant City of Los Angeles in an amount to be proven at the trial of this matter.

128.   By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

### FIRST CLAIM FOR RELIEF
### DEPRIVATION OF CIVIL RIGHTS --
### 42 U.S.C. § 1983 - - *BRADY* VIOLATIONS
### (Against Defendants Winn, Razanskas and Does 1-10)

129.   Plaintiff realleges paragraphs 1 - 128, as well as any subsequent paragraphs in the Complaint, as if fully set forth herein.

130.   Defendants Winn and Razanskas and Does 1 - 10, while acting under

1  color of law, deprived Plaintiff of his civil rights by violating his right to have

2  material exculpatory evidence and information as required by *Brady v. Maryland*,

3  373 U.S. 83 (1963) (hereinafter *Brady* information) turned over to the prosecutors

4  handling the prosecution of Mr. Anthony so that it could in turn be provided to the

5  Anthony defense.

6     131.   The actions of each defendant in withholding evidence from

7  prosecutors were done with deliberate indifference to or reckless disregard for

8  Plaintiff's rights or for the truth.

9     132.   The *Brady* violations asserted herein encompass, but are not limited to:

10     A.   Failure to disclose Defendants Winn and Razanskas role in tainting the

11  identifications of Mr. Anthony and Mr. Cole by feeding information to John Jones

12  and pointing out Mr. Anthony's and Mr. Cole's pictures that improperly led him

13  into selecting Mr. Anthony and Mr. Cole as the murder suspects in the Felipe

14  Gonzales murder case by: (1) Detective Winn's tapping on the photographs of Mr.

15  Anthony and Mr. Cole as she passed out the six-packs, which he understood as the

16  persons Defendants wanted him to identify; (2) telling John Jones that Mr. Anthony

17  and Mr. Cole were arrested together and were partners, and that Defendants were

18  confident that they had the right men; (3) telling John Jones that Mr. Anthony went

19  by the moniker "Baby Day" and had a "Baby Day" tattoo when this information was

20  not true, and led Mr. Jones into believing he identified the right people; (4) telling

21  John Jones during the the live line-up that Reggie Cole had a gunshot wound on his

22  leg, which made him certain that he had correctly identified both Mr. Anthony and

23  Mr. Cole, but did not tell him that the wound was at least 6 years old and therefore

24  completely irrelevant; and (5) telling John Jones that one of the men he had

25  identified had also been identified by Arthur Jones, a security guard at Martin

26  Luther King Hospital who had seen the same person approach the hospital with a

27  gunshot wound to the leg.  Supplying information to eyewitnesses, and pointing at

28  defendants' pictures in a photospread during an eyewitness identification procedure

1   are coercive investigation techniques in violation of Mr. Anthony's constitutional

2   rights under *Manson v. Brathwaite,* 432 U.S. 98 (1977), and *Neil v. Biggers*, 409

3   U.S. 188 (1972). John Jones never saw the perpetrators well enough to identify

4   them. Defendants Winn and Razanskas either knew or should have known that fact,

5   and acted with reckless disregard for the fact when they submitted the so-called

6   positive identifications to the defense in the murder book, and actively concealed the

7   unreliable, tainted identification of John Jones that was produced by their illegal

8   conduct.

9         B.    Failure to disclose Defendants Winn and Razanskas' role in tainting the

10   identifications of Mr. Anthony and Mr. Cole by feeding information to the security

11   guard Arthur Jones which improperly led him into selecting Mr. Anthony and Mr.

12   Cole as the people he had seen at the hospital, and thereby bolstering the case

13   against Plaintiffs. Arthur Jones made his first positive identification of Mr. Anthony

14   at the preliminary hearing as being the person who assisted the injured man, after

15   Defendants Winn and Razanskas told him they had caught the perpetrators and had

16   a case, and that one of the men he had identified in the live lineup had been shot in

17   the leg. The Defendants concealed the fact that they had fed Arthur Jones this

18   information.

19         C.    The detectives also concealed the fact that Arthur Jones, a security

20   guard who positively identified Reggie Cole and Mr. Anthony at trial, identified

21   someone other than Reggie Cole in the six-pack that included Mr. Cole's

22   photograph.

23         D.    Failure to disclose Defendants Winn and Razanskas' role in

24   tainting the identifications of Mr. Anthony and Mr. Cole by feeding information to

25   the third and final eyewitness, Victor Trejo, that improperly led him into selecting

26   Mr. Anthony and Mr. Cole as the murder suspects at the preliminary hearing by

27   concealing the fact that they told him prior to the preliminary hearing that they had

28   caught the men who had shot him and killed his friend.

E.    Defendant Winn concealed the facts that she showed the six-packs to Mr. Brock for identification purposes, and that she showed the six-packs to Mr. Wilson, neither of whom identified Mr. Cole or Mr. Anthony.

F.    Defendants Winn and Razanskas concealed from the defense the facts that John Jones received a deal for his testimony that saved him from the 12-year sentence in prison recommended by the probation department.  Defendant Winn, who was present in court, failed to correct John Jones' false testimony.

G.    Defendants Winn and Razanskas concealed from the defense facts that an alternative theory to the murder of Felipe Gonzales existed, that the detectives suspected and either knew or should have known that John Jones was the third shooter, that he was on the roof during the crime, that he may have fired the bullet that killed Felipe Gonzales, and they concealed slugs they found on the roof.  This information would have also further discredited John Jones' identification, as firing a gun causes momentary blindness for the shooter and John Jones only saw the robbers briefly as they were running away.

H.    Defendants Winn and Razanskas concealed from the defense the angle from which John Jones allegedly witnessed the shooting, not from the window of the second floor to which he testified, but from the roof top, which made his view of the perpetrators much more difficult because of the increased distance and steep downward angle, which would have impeached his identification.  Detective Winn, who was present in court, failed to correct John Jones' false testimony as well.

133.    The constitutional source of the obligation to provide *Brady* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein.  Plaintiff brings this claim as both a procedural and a substantive due process violation.   To the extent that any court were to conclude that the source of Plaintiff's right to *Brady* information is a constitutional source other than due process (such as the Fourth Amendment or Sixth Amendment right to a fair trial),

1 | this claim is brought on those bases as well.

2 |     134.   Defendants Winn and Razanskas and the other Doe defendants were
3 | each jointly and severally responsible to provide *Brady* information to the
4 | prosecutors handling the Anthony case so that it could in turn be provided to the
5 | Anthony defense.  Each engaged in, knew or should have known of the
6 | unconstitutional conduct alleged herein and failed to prevent it, which each had a
7 | responsibility to do, and each ratified, approved or acquiesced in it.

8 |     135.   As a result of the defendants', and each of their, violations of Mr.
9 | Anthony's constitutional rights to have *Brady* information turned over to the
10 | prosecutors handing his case, Mr. Anthony was damaged as alleged above.

11 | **SECOND CLAIM FOR RELIEF**
12 | **JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS - -**
13 | **42 U.S.C. § 1983 - - *BRADY* VIOLATIONS**
14 | **(Against Defendants Winn, Razanskas, and Does 1-10)**

15 |     136.   Plaintiff realleges paragraphs 1 - 135, as well as any subsequent
16 | paragraphs contained in the Complaint, as if fully set forth herein.

17 |     137.   Defendants Winn, Razanskas and Does 1 - 10 were jointly and
18 | severally responsible as investigators assigned to the Anthony case to share material
19 | information with each other, and to ensure that *Brady* information was turned over
20 | to the prosecutors handling the Anthony case.

21 |     138.   Defendants Winn, Razanskas and Does 1 - 10, acting under color of
22 | state law, acted in concert, conspired and agreed to deprive Plaintiff of rights,
23 | privileges, or immunities secured by the Constitution and laws of the United States,
24 | in particular the right to have *Brady* information of which they were aware provided
25 | to the prosecutors prosecuting the Anthony case, as elaborated above.  Each failure
26 | to provide *Brady* information, as well as other actions related to them, constitutes an
27 | overt act in furtherance of said conspiracy.

28 |     139.   Alternatively, as joint actors with joint obligations, each of them was

1 | and is responsible for the failures and omissions of each other.

2 | 140.   As a result of defendants', and each of their, violations of Mr.

3 | Anthony's constitutional right to have *Brady* information turned over to the

4 | prosecutors handling this case, Mr. Anthony was damaged as alleged above.

### THIRD CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS 42 U.S.C. § 1983 - -

### *MANSON/BIGGERS* VIOLATIONS

### (Against Defendants Winn, Razanskas and Does 1-10)

9 | 141.   Plaintiff realleges paragraphs 1- 140, as well as any subsequent

10 | paragraphs contained in the Complaint, as if fully set forth herein.

11 | 142.   Defendants Winn, Razanskas and Does 1 - 10, while acting under color

12 | of law, deprived Plaintiff of his civil rights by violating his right to have an

13 | eyewitness identification by John Jones, Arthur Jones, and/or Victor Trejo, that was

14 | free from suggestion or influence by the police, as alleged above, pursuant to

15 | *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972).

16 | The actions of each defendant in violating Plaintiff's right to have an eyewitness

17 | identification by John Jones, Arthur Jones and/or Victor Trejo that was free from

18 | suggestion or influence by police were done with deliberate indifference to and/or

19 | reckless disregard for Plaintiff's rights or for the truth.

20 | 143.   The constitutional source of the obligation to conduct eyewitness

21 | identifications free from improper suggestion or influence is the due process clause

22 | of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were

23 | violated by the conduct alleged herein.  Plaintiff brings this claim as both a

24 | procedural and a substantive due process violation.   To the extent that any court

25 | were to conclude that the source of Plaintiff's right to eyewitness identifications free

26 | from improper suggestion or influence is any constitutional source other than due

27 | process (such as the Fourth Amendment or Sixth Amendment right to a fair trial),

28 | this claim is brought on those bases as well.

144.    The acts of improper suggestion and influence include, but are not limited to, the acts alleged in paragraphs 1- 128, and 132, above.  The acts also include the concealment by defendants Winn and Razanskas of their misconduct from the defense, and the concealment of the perjury by John Jones concerning his identification, as alleged in paragraphs 1- 128 and 132, above.

145.    Defendants Winn, Razanskas and Does 1 - 10 were each jointly and severally responsible to ensure that any identification procedure was free from suggestion or influence by Police, and violated that responsibility.  Each engaged in, knew, or should have known of the unconstitutional conduct alleged herein, and ratified, approved or acquiesced in it.

146.    As a result of defendants', and each of their, violations of Mr. Anthony's constitutional rights as alleged above, Mr. Anthony was damaged as alleged above.

## FOURTH CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS - - 42 U.S.C. § 1983 - -

### FALSE EVIDENCE VIOLATIONS

### (Against Defendants Winn, Razanskas and Does 1-10)

147.    Plaintiff realleges paragraphs 1- 146, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

148.    Defendants Winn, Razanskas, and Does 1 - 10, were jointly and severally responsible as investigators assigned to the Anthony case to share material information with each other, and to ensure that any eyewitness identification was free from suggestion or influence by the police.

149.    Defendants Winn, Razanskas and Does 1 - 10, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to have eyewitness identifications by John Jones, Arthur Jones and/or Victor Trejo occur free from suggestion or influence by the police, as

1  elaborated above.  Each act of improper influence, as well as other actions related to
2  them, constitutes an overt act in furtherance of said conspiracy.

3      150.   Alternatively, as joint actors with joint obligations, each of them was
4  and is responsible for the failures and omissions of each other.

5      151.   As a result of defendants', and each of their, violations of Mr.
6  Anthony's constitutional rights to have eyewitness identifications free from
7  improper  influence and suggestion by the police in violation of the Constitution,
8  Mr. Anthony was damaged as alleged above.

9                          **FIFTH CLAIM FOR RELIEF**
10                       **DEPRIVATION OF CIVIL RIGHTS - -**
11             **42 U.S.C. § 1983 - - FALSE EVIDENCE VIOLATIONS**
12                 **(Against Defendants Winn, Razanskas and Does 1-10)**

13      152.   Plaintiff realleges paragraphs 1- 151, as well as any subsequent
14  paragraphs contained in the Complaint, as if fully set forth herein.

15      153.   Defendants Winn, Razanskas and Does 1 - 10, while acting under color
16  of law, deprived Plaintiff of his civil rights, more particularly, his right to due
17  process of law, by providing false evidence in reports and statements outside of live
18  testimony, improperly influencing witnesses and fabricating and concealing
19  evidence, that resulted in depriving Mr. Anthony of liberty because they set in
20  motion a reasonably foreseeable chain of events that led to the presentation of false
21  evidence at Plaintiff's 1995 criminal trial, his conviction and incarceration.

22      154.   Each defendant knew or should have known the evidence was false,
23  and the defendant's conduct was done with deliberate indifference to and/or reckless
24  disregard of Plaintiff's rights or for the truth.

25      155.   Each defendant deliberately mischaracterized the eyewitness
26  identifications of John Jones, Arthur Jones and Victor Trejo, and used interviewing
27  and investigation techniques so abusive that they knew or should have known that
28  they would, and are known to, yield false evidence.  Defendants Winn and

PLF'S COMPLAINT

45

1   Razanskas deliberately concealed and fabricated evidence that led to a false and

2   wrongful conviction.  The false evidence asserted herein encompasses, the conduct

3   alleged in paragraphs 1- 128, and paragraph 132.

4        156.    Defendants Winn, Razanskas and Does 1 - 10 knew or should have

5   known that evidence set forth above, was false, and that the witnesses were

6   providing false evidence.

7        157.    The constitutional source against using false evidence is primarily the

8   due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due

9   process rights were violated by the conduct alleged herein.  Plaintiff brings this

10  claim as both a procedural and a substantive due process violation.   To the extent

11  that any court were to conclude that the source of Plaintiff's right to eyewitness

12  identifications free from improper suggestion or influence, right to be free from

13  concealed and fabricated evidence that led to a false and wrongful conviction, is any

14  constitutional source other than due process (such as the Fourth Amendment or

15  Sixth Amendment right to a fair trial), this claim is brought on those bases as well.

16       158.    Defendants Winn and Razanskas and the other Doe defendants were

17  each jointly and severally responsible to not use false evidence against Mr. Anthony.

18  Each engaged in, knew or should have known of the unconstitutional conduct

19  alleged herein and failed to prevent it, which each had a responsibility to do, and

20  each ratified, approved or acquiesced in it.

21       159.    As a result of the defendants', and each of their, violations of Mr.

22  Anthony's constitutional right to not have false evidence turned over to the

23  prosecutors handling this case and ultimately to the defense, Mr. Anthony was

24  damaged as alleged above.

25  / /

26  / /

27

28

## SIXTH CLAIM FOR RELIEF

## JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS - -

## 42U.S.C. § 1983 - - FALSE EVIDENCE VIOLATION

### (Against Defendants Winn, Razanskas and Does 1-10)

160.   Plaintiff realleges paragraphs 1- 159, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

161.   Defendants Winn, Razanskas, and Does 1 - 10, were jointly and severally responsible as investigators assigned to the Anthony case to not use false evidence.

162.   Defendants Winn, Razanskas and Does 1 - 10, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right not to have false evidence used in the Anthony case, as elaborated above.  The use of false evidence, as well as other actions related to the use of such evidences, constitutes an overt act in furtherance of said conspiracy

163.   Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

164.   As a result of defendants', and each of their, violations of Mr. Anthony's constitutional rights to not have false evidence used against him, Mr. Anthony was damaged as alleged above.

## SEVENTH CAUSE OF ACTION

## DEPRIVATION OF CIVIL RIGHTS

## 42 U.S.C. § 1983, SUPERVISORIAL LIABILITY

### (Against Defendants Razanskas and Does 1-10)

165.   Plaintiff realleges paragraphs 1- 164, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

166.   During the course and scope of the Anthony investigation, Defendant Winn was a detective trainee, and was being supervised on the Anthony

1   investigation by Defendant Razanskas.  Defendant Razanskas was an experienced
2   detective, and was obligated to ensure that Defendant Winn properly performed her
3   duties as an investigator, which would also include ensuring that Mr. Anthony's
4   constitutional rights were protected.

5       167.   On March 27, 1994, the night of the murder in this case, Defendant
6   Razanskas was training and supervising Defendant Winn, who was a trainee on her
7   first homicide case.  During the entirety of the investigation of this case, Defendant
8   Pete Razanskas, was Defendant Winn's supervisor, partner and trainer.  Upon
9   information and belief, Defendant Pete Razanskas and Doe supervisors within the
10  Los Angeles Police Department who were responsible for monitoring Defendant
11  Winn's performance and conduct as a Detective in this investigation, were on notice
12  of her lack of experience and training as a homicide Detective and failed to take
13  adequate steps to correct it through training or supervision.

14      168.   Upon information and belief, Defendant Winn received minimal
15  discipline, training, and supervision, which level was grossly insufficient to address
16  the inept, inadequate and deceitful investigation conducted in the Anthony case.

17      169.   The inept inadequate and deceitful investigation was a highly
18  predictable or plainly obvious consequence of the inadequate training and lack of
19  meaningful control or supervision of Defendant Winn.

20      170.   Defendant Razanskas, and Doe supervisors 1-10, acting within the
21  course and scope of their employment had a duty to assure the competence of their
22  employee/agents, including Defendant Winn and Does 1-10, but breached their duty
23  and were negligent in the performance of their duties by selecting, training,
24  reviewing, supervising, failing to supervise, failing to control, evaluating the
25  competency and retaining Defendant Winn and other employee/agents.  This breach
26  of the duty of careful selection, training, review, supervision, periodic evaluation of
27  the competency, and retention of such law enforcement officers and /or employees
28  and /or agents created an unreasonable risk of harm to persons such as Plaintiff.

171.    Defendant Razanskas, and Doe supervisors 1-10 knew or should have known that Defendant Winn was unfit and/or incompetent to investigate the homicide due to her lack of experience unfitness and/or incompetence created a particular risk to others. The negligence of Defendant Razanskas and Doe supervisors 1-10 in the supervision and training of Defendant Winn was a substantial factor in the harm caused to Plaintiff by Defendant Winn.

172.    Defendant Razanskas, and Doe supervisors 1-10 breached their duty of care to observe, report, monitor and control the investigation by Defendant Winn and other employee/agents.

173.    As a direct and legal result of the aforesaid negligence, carelessness and unskillfulness of Defendant Razanskas, and Doe supervisors 1-10, and each of them, and as a result of their breach of duty of care to Plaintiff, Plaintiff suffered the damages as alleged herein.

## EIGHTH CAUSE OF ACTION

### DEPRIVATION OF CIVIL RIGHTS- -

### 42 U.S.C. § 1983 - - MONELL VIOLATIONS

### (Against Defendant City of Los Angeles)

174.    Plaintiff realleges paragraphs 1- 173, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

175.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Defendant City of Los Angeles, and Does 1 - 10, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, engage in the unconstitutional conduct and omissions as is specifically elaborated in ¶¶ 1- 128 and 132, above, which consist of the following customs and/or policies:

    A.  The knowing presentation of false evidence by officers;

    B.  The deliberately indifferent presentation of false evidence by officers;

    C.  The presentation of false evidence by deputies in reckless disregard for

1  the truth or the rights of the accused;

2      D.  Officers' failure to provide exculpatory evidence to prosecutors trying

3  the case involving the criminal defendant;

4      E.  Failing to adequately train, supervise and control its officers in the

5  investigation and questioning of eyewitnesses, including the prevention of

6  unconstitutional influence of eyewitnesses, and thereby prevent the use of fabricated

7  eyewitness identifications;

8      F.  Failing to adequately train, supervise and control its officers to disclose

9  to the deputy district attorney prosecuting a defendant all exculpatory and

10  impeachment information, including *Giglio v. United States*, 405 U.S. 150 (1972)

11  and *Brady* information, which would include deals informants received for

12  testifying in a case; alternative theories which would support the defense; the

13  disclosure of witnesses who could not identify the defendants; and impeachment

14  information concerning the witnesses;

15      G.  Failing to  adequately discipline officers involved in dishonesty or

16  otherwise abusing their authority;

17      H.  Condoning and encouraging officers in the belief that they can violate

18  the rights of person such as Mr. Anthony with impunity, and that such conduct will

19  not adversely affect their opportunities for promotion and employment benefits; and;

20      I.  Condoning and encouraging the fabrication of evidence including but

21  not limited to the filing of materially false police reports, concealing material

22  evidence and improperly influencing witnesses, the use of techniques to influence

23  eyewitness identifications, and/or making false statements to the prosecutor to

24  obtain the filing of false charges and obtaining false convictions.

25      176.   The actions and inactions of the Los Angeles Police Department set

26  forth in paragraphs ¶¶ 1- 128, 132 and 175, were known or should have been known

27  to the policy makers responsible for the Los Angeles Police Department and

28  occurred with deliberate indifference to either the recurring constitutional violations

1 | elaborated above, and/or the strong likelihood that constitutional rights would be

2 | violated as a result of failing to train, supervise or discipline in areas where the need

3 | for such training and supervision was obvious.

4 |      177.    The actions of the Los Angeles Police Department set forth herein were

5 | a motivating force behind the violations of Mr. Anthony's constitutional rights as set

6 | forth in the Complaint.

7 |      178.    As a direct and proximate result of Defendant City of Los Angeles acts

8 | and omissions, condoning, encouraging, ratifying and deliberately ignoring the

9 | pattern and practice of Defendants Winn, Razanskas and Does 1 - 10 acts and

10 | omissions, Plaintiff sustained injury and damage.

11 |      179.    As a result of defendants', and each of their, violations of Mr.

12 | Anthony's constitutional rights as set forth herein, Mr. Anthony was damaged as

13 | alleged above.

14 |     WHEREFORE, Plaintiff, Obie Steven Anthony III, requests relief on his own

15 | behalf as follows, and according to proof, against each Defendant:

16 |     1.    General and compensatory damages in any amount according to proof;

17 |     2.    Special damages in any amount according to proof;

18 |     3.    Exemplary and punitive damages against each Defendant, except the

19 |           City of Los Angeles, in an amount according to proof;

20 |     4.    Cost of suit, including attorneys' fees, under 42 U.S.C. 1988; and,

21 |     5.    Such other relief as may be warranted or as it just and proper.

22 | / /

23 | / /

24 |

25 |

26 |

27 |

28 |

1

## JURY DEMAND

2     Trial by jury of all issues is demanded.

3

4                         Respectfully submitted,

5

6

7                         KAYE McLANE & BEDNARSKI, LLP

8

9 DATED: August _10_, 2012     By _____

10                         DAVID S. McLANE

                           MARILYN E. BEDNARSKI

11                         KEVIN J. LaHUE

12

13

14                         NORTHERN CALIFORNIA

                        INNOCENCE PROJECT

15

16

17 DATED: August _10_, 2012     By _____

                         LINDA STARR

18                         PAIGE KANEB

19                         Attorney for Plaintiff

20                         OBIE STEVEN ANTHONY III

21

22

23

24

25

26

27

28

Name & Address:
David S. McLane; Marilyn E. Bednarski
Kevin LaHue
Kaye, McLane & Bednarski, LLP
234 E. Colorado Blvd., Ste. 230
Pasadena, CA 91101
(626) 844-7660 (626) 844-7670
email: dmclane@kmbllp.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OBIE STEVEN ANTHONY III,<br><br>                                        **PLAINTIFF(S)**<br><br>                    v.<br><br><br>CITY OF LOS ANGELES; MARCELLA WINN;<br>PETER RAZANSKAS; and DOES 1 - 10 INCLUSIVE,<br><br>                                        **DEFENDANT(S).** | CASE NUMBER<br><br>EDCV12-1332 DSF (D7bx)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):  CITY OF LOS ANGELES; MARCELLA WINN; PETE RAZANSKAS;
          and DOES 1 - 10 INCLUSIVE

          A lawsuit has been filed against you.

          Within 2 1 days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☐ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer
or motion must be served on the plaintiff's attorney, _____, whose address is
_____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint.  You also must file
your answer or motion with the court.

          AUG 1 0 2012                              Clerk, U.S. District Court

     Dated: _____          By: _____
                                                  JULIE PRADO
                                                  Deputy Clerk

                                              *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed
60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| OBIE STEVEN ANTHONY, III | CITY OF LOS ANGELES; MARCELLA WINN; PETE RAZANSKAS; and DOES 1-10 INCLUSIVE |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| David S. McLane, Kaye McLane & Bednarski 234 E. Colorado Blvd. Ste 230 Pasadena CA 91101 (626) 844- 7660;  Linda Starr, No. Cal. Innocence Project, 900 Lafayette St. Ste 105 Santa Clara, CA. 95050 Ph (408) 554 -1945 | Carmen Trutanich, Surekha Pessis & Wendy Shapero, LA City Attorney's Office, 200 N. Main St. 6th FL. Los Angeles, CA 90012 Ph 213 978 7029 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:    JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No  ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Deprivation of and Interference with Civil Rights Title 42 U.S.C. Section 1983

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☑ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**    Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): _Cole v. City of Los Angeles, et al., 11-CV-03241-CMB-AJW_

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
      ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
      ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
      ☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Obie Steven Anthony III: San Bernardino County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| City of Los Angeles Police Department:Los Angeles; LAPD Detective Marcella Winn: unknown;  Pete Razanskas: unknown. | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _[signature]_      Date August 10, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |